Oliver R. Grace, Respondent, v Michael C. Nappa, Appellant, et al., Defendants.

Second Department, May 29, 1978

## APPEARANCES OF COUNSEL

*Farrell, Fritz, Caemmerer & Cleary, P. C. (John M. Armentano* and *Samuel S. Tripp* of counsel), for appellant.

*Irving Bizar* for respondent.

## OPINION OF THE COURT

Shapiro, J.

The judgment in favor of the plaintiff should be reversed, his complaint should be dismissed and the action should be remanded for a trial on the counterclaim of defendant-appellant Nappa for specific performance or, in the alternative, for money damages.

On a prior appeal (Grace v Nappa, 48 AD2d 922) we reversed a grant of summary judgment to plaintiff and, inter alia, said:

"Plaintiff and defendant Nappa entered into a contract for the sale of certain real property. The contract price was $525,000. The sum of $52,500 was payable by plaintiff upon the signing of the contract, $333,981.51 was payable at the closing, and plaintiff was to take subject to a first mortgage in the amount of $138,518.49. At the time of the delivery of the deed, the seller was to produce a mortgage reduction certificate 'executed and acknowledged by the holder of such mortgage and in form for recording, certifying as to the amount of the unpaid principal and interest thereon, date of maturity thereof and rate of interest thereon'. The parties further agreed that 'time shall be deemed as of the essence as against both the Seller and the Purchaser' and provided that 'the seller shall give and the purchaser shall accept a title such as the Title Guarantee Company * * * will approve and insure.'

"Defendants' efforts to secure the mortgage reduction certificate were unavailing. On the law day, when the parties came together, defendants tried to show the outstanding balance of the mortgage by means other than the mortgage reduction certificate. Defendant Nappa produced 15 canceled checks, each payable to the mortgagee in an amount corresponding to the quarterly mortgage payments shown on the amortization schedule issued at the time the mortgage was given.

"The amortization schedule showed the dates payments were due, their application to interest and principal, and that the balance of the mortgage, after 15 payments were made, would be $138,518.49. Defendants also assert that they obtained authorization from the title company of its willingness to 'certify and assure' the amount outstanding to be the amount set forth in the agreement, upon defendant Nappa's offer to place in escrow with the title company the original

face amount of the mortgage. This authorization was obtained two hours after the parties had separated, since the title company representative present at the closing was not authorized to accept his offer.

"The issue is whether the only satisfactory indication of the amount of the mortgage outstanding as stated in the contract was the mortgage estoppel certificate, or whether defendant Nappa offered such proof of the outstanding balance of the mortgage that a reasonable person could confidently perform his side of the agreement, secure in the knowledge that he was buying a house on the terms to which he had agreed. To determine that we must look at the agreement as a whole and not necessarily give literal effect to the wording of one of its paragraphs. *The trier of the facts, in looking at the relationship of the parties, has a right to determine the issues by considering whether plaintiff had contracted to buy an estoppel certificate or a half-million dollar parcel of real property.*" (Emphasis supplied.)

During the trial which followed, the plaintiff discontinued his action against the other two defendants; judgment was entered only against defendant-appellant Nappa for the sum of $52,500, representing the down payment, plus interest, expenses, costs and disbursements, making a total of $69,159.70.

I believe, contrary to the determination of the Trial Term, that appellant offered sufficient proof "of the outstanding balance of the mortgage that a reasonable person could confidently perform his side of the agreement, secure in the knowledge that he was buying a house on the terms to which he had agreed." Plaintiff's refusal to accept such proof or to accept appellant's offer to place the entire amount of the mortgage in escrow conclusively showed not only bad faith on plaintiff's part, but also clearly indicated that in the absence of being able to coerce the seller into giving him better terms he was trying to *welch* on the deal.

### THE PRECLOSING FACTS

On May 2, 1973 appellant contracted to sell his residential premises to the plaintiff for $525,000, payable as follows: $52,500 upon the execution of the contract, $333,981.51 at the closing of title, and $138,518.49 by the vendee assuming an existing first mortgage held by one Wilson A. Shelton. The time of closing of title was to be June 15, 1973 at 11:00 A.M.,

and it was stated that "time shall be deemed as of the essence as against both the Seller and the Purchaser."

Mr. Shelton was the prior owner. Upon the sale of the property by Shelton to the appellant on June 16, 1969 he took back a 10-year purchase-money mortgage in the amount of $200,000, *which had full prepayment privileges* and provided for constant quarter-annual payments.

The printed provisions of the contract between the plaintiff and appellant provided that the appellant deliver, at the closing, "a proper certificate executed and acknowledged by the holder of such mortgage and in form for recording, certifying as to the amount of the unpaid principal and interest thereon, date of maturity thereof and rate of interest thereon, and the seller shall pay the fees for recording such certificate." It was the failure of the appellant to produce such a certificate at the closing, and the plaintiff's refusal to accept substitute documentation or other proposals made by him, which aborted the closing.

*Plaintiff* testified that between the contract and the closing date the holder of the mortgage, Mr. Shelton, called him and stated that he wanted the mortgage "paid off". When told that this was not being done, he advised plaintiff that "I think you have to", whereupon plaintiff told him to consult his attorney.

On May 14, 1973 (12 days after the contract was signed), the appellant's attorney, Mr. Fasolo, called Mr. Shelton and advised him that he needed "a sworn statement regarding the amount of this mortgage." He further testified that, in answer to Mr. Shelton's expressed displeasure at the continuance of the mortgage [instead of its being paid off in full], he told Mr. Shelton that "Mr. Nappa has other use for his money, and that is the arrangement we made with Mr. Grace", the vendee.

On June 7, 1973 Mr. Fasolo called Mr. Shelton and again reminded him that he "needed the sworn statement." Mr. Fasolo testified that Mr. Shelton repeated his desire to have the mortgage paid off, and that Mr. Shelton said: "Well, you have it prepared and send it on to me * * * I'll take it up with my attorney and get back to you."

According to Mr. Fasolo, he called Mr. Shelton the following day, but Mr. Shelton was not in. He called again on Monday, June 11, and left a message with Mr. Shelton's secretary "to remind him to send on the sworn statement, the certificate * * * [which should] indicate the mortgage is in good standing

as far as he is concerned." He was told by Mr. Shelton's secretary that she had a message for Mr. Fasolo to call Mr. Shelton's attorney, a Mr. Wood [who had been Mr. Shelton's attorney upon the sale of the premises to appellant in 1969]. He thereupon called Mr. Wood, who told him: "I don't know anything about this. Mr. Shelton has not spoken to me, but I'll take it up with him."

Mr. Fasolo testified that he called Mr. Wood on the following day and asked: "Are you preparing and sending on the estoppel certificate?" Mr. Wood replied: "Well, my client doesn't desire to send the estoppel certificate. He wishes Mr. Nappa to pay this mortgage off. He sees no reason to send it on." After further conversation, Mr. Wood said: "Well, I'll speak to him, but I'm incline[d] to think he'll not do it."

Mr. Fasolo testified that he thereupon called the Title Guarantee Company (from whom the plaintiff had ordered a title search and policy) and that he spoke to Max Weiss, Esq., its chief counsel. As a result of such conversation he sent a notice to Mr. Shelton demanding the certificate. That letter was as follows:

"June 14, 1973

"CERTIFIED MAIL—#379527

"Mr. Wilson A. Shelton
American Home Products Corp.
685 Third Avenue
New York, N.Y. 10017

"Re: Nappa to Shelton Mortgage
Nappa to Grace Conveyance
Cove Neck Road
Oyster Bay, New York
Our File: 7725-Z-1

"Dear Mr. Shelton:

"Enclosed herewith please find a copy of a payment schedule covering the mortgage in this matter. The red line denotes the last payment made by Michael C. Nappa to you. It is the 15th payment made on or about March 14, 1973 (3 years and 9 months from the date of the mortgage instruments). The principal outstanding is $138,518.49 with interest of $2,077.78 as of June 15th, 1973. There are no offsets or defenses.

"Mr. Nappa did not use your payment schedule since the payment set forth in the obligation is $6,685.47 and not your figure of $6,685.43.

"Formal demand is herewith made upon you to forward to me a proper certificate executed and acknowledged by you in a form for recording, certifying as to the amount of the unpaid principal and interest thereon, date of maturity thereof and rate of interest thereon.

"Your prompt attention and courtesy will be appreciated.

Yours very truly,
William A. Fasolo"

Mr. Fasolo further testified that on that date he again called Mr. Wood "and told him of the statutory provision, and that I could get a court order to compel the delivery of the estoppel certificate, and I was getting a little upset, and I also said to him I think Shelton should be careful because he may be interfering in contractual rights where he shouldn't be, and it may be a tortious act." Mr. Fasolo testified: "I then received a telephone call from Mr. Shelton telling me to mind my own business, to solve my own problems." Mr. Shelton iterated that he wanted payment of the mortgage.

On June 14 Mr. Fasolo received a letter from Mr. Shelton, dated June 12. That letter was as follows:

"Dear Mr. Fasolo:

"I received a message from you yesterday, through my secretary, asking me to notify you how much Mr. & Mrs. Nappa will owe me as of June 15th—and asking me to state that the mortgage is in good standing. I do not know what you mean by the phrase 'in good standing'. If you are asking whether or not the mortgage is in full force and effect, it is. However, if you are asking whether or not from a personal standpoint the mortgage is in good standing with me personally, it is not, as a number of payments have been late, as Mr. Nappa must often be reminded of the payments, as he has failed over a period of years to provide me with evidence of an insurance policy protecting my interest in the property, and as he may also have failed to comply with other provisions of the mortgage loan agreement.

"As to the unpaid principal and interest figures as of June 15, 1973, such date of June 15th has no relevance to the dates of payments required under the mortgage. Accordingly, you

should compute any such figures yourself. I wrote you on September 5, 1969, before the first quarterly payment fell due, attaching a schedule of payments for Mr. Nappa's convenience, showing precise interest and principal amounts over a 40-payment period, but this was ignored by Mr. Nappa, or not passed on by you, as he has made out checks that differ slightly from payment amounts shown on that particular schedule.

"From here out, I trust that you will look into your client's questions, problems and obligations yourself, and not further shift the burden to me to tell you or others what he may or may not have to sell, to tell you what he and his wife may or may not owe, to tell you or others what he may or may not be free to convey based on a title company's exceptions long since made known to you, to intervene on his behalf with the mayor or trustees of the Village of Cove Neck, nor to tell you what risk of foreclosure proceedings your client may run by not complying with the terms of his mortgage loan agreement.

Yours truly,<br>WILSON A. SHELTON"

### WHAT OCCURRED AT THE "CLOSING"

The closing was held at the office of Abraham Altus, Esq., the buyer's attorney. Appellant and Mr. Fasolo arrived there with the following documents in lieu of the estoppel certificate:

(a) A copy of the Shelton mortgage papers (which had also been sent to Mr. Altus prior to the closing);

(b) A schedule of payments (of the type prepared by companies which prepare amortization schedules) showing that it was based on a mortgage of $200,000 with 40 payments over a period of 10 years, with interest at 6% and showing the constant quarterly payments to be in the sum of $6,685.47, except for the last payment which would be approximately $3 less at the time that the mortgage would be fully amortized. The schedule had inked notations, apparently made by Mr. Nappa, showing payments beginning September 13, 1969 and payments following that at three-month intervals. According to the schedule, the last payment made prior to the closing date was on March 14, 1973; the balance of the mortgage (giving credit for such payment) was then $138,518.49; and

(c) Fifteen "paid" checks drawn by Mr. Nappa to the order of Mr. Shelton, each in the sum of $6,685.47; the first was dated September 13, 1969 and the last was dated March 14, 1973.

Mr. Fasolo advised Mr. Altus of the difficulties he had had with Mr. Shelton, and also showed him Mr. Shelton's letter. He advised Mr. Altus that there had been no defaults on the mortgage, that the amount shown on his schedule as the balance of the mortgage was correct, and that it matched the amount stated in the contract. With reference to Mr. Shelton's statement in his letter, that the checks made out by Mr. Nappa "differ slightly from payment amounts" shown on Mr. Shelton's schedule, Mr. Fasolo pointed out that the discrepancy between the two schedules resulted in only a a four cent difference as to the balance owing after the payment of March 14, 1973.

As to Mr. Shelton's complaint in the letter about the nonproduction of an insurance policy, Mr. Fasolo pointed out that he had proof of such insurance with him.

Mr. Altus, plaintiff's attorney, admitted that Mr. Fasolo, appellant's attorney, had offered to put "some money" in escrow with the title company so that the title company could insure that there had been no default under the mortgage and that Mr. Fasolo requested a short adjournment of the closing to obtain the estoppel certificate. Mr. Altus refused the latter request in view of the contract provision that time was of the essence.

Mr. Fasolo testified that Mr. Altus kept repeating: "Time is of the essence. The contract provides for the estoppel certificate. We want the estoppel certificate." He pointed out to Mr. Altus that although "the assumption figure" in the mortgage was some $138,000, his client, the seller, would "put in escrow $200,000 *or more*" and that the sum could be held until the estoppel certificate would be obtained. Mr. Fasolo stated that such period could not be a lengthy one since a formal request had been made for such certificate, pursuant to the statute (Real Property Law, § 274-a). *Mr. Fasolo further testified (and plaintiff does not controvert this) that his client was "ready and willing to take back a mortgage from Mr. Grace on the exact terms provided within the agreement and within the bond and mortgage that we're concerned about." This could be done because Shelton's mortgage contained a prepayment clause.*

The title closer, Mr. Singer, stated that he was not empowered to act for the title company in this regard without speaking to his superior, Mr. Weiss. At that point Mr. Altus said: "If he did, we would not accept it anyway."

Despite the statement of Mr. Altus, Mr. Fasolo called the title company and was told that Mr. Weiss (as well as any other attorney who might have authority) was out to lunch and could not be reached until 2:30 P.M. Mr. Fasolo thereupon called the office of the title company in Hackensack, New Jersey, with which he had done business. He reached the manager of the office, Albert Arrigo, on the telephone and, after speaking to him, put Mr. Singer on the telephone. Mr. Singer told Mr. Arrigo that "the lawyer for the purchaser would not accept the arrangement even if the title company did."

As a result, the closing aborted shortly after noon. The penultimate discussions related to an offer made by Mr. Altus to the effect that his client was willing to adjourn the closing until the estoppel certificate would be obtained, *provided he was given possession for 90 days at no expense.* The discussions made clear that this meant that the seller was to pay the mortgage interest, taxes, insurance, etc., for such 90-day period. Mr. Fasolo pointed out that the certificate was expected to be received within, at the most, 20 days and he offered the counter suggestion of a 20-day period for occupancy by the buyer at the seller's expense. This was not accepted.

The final suggestion made by Mr. Altus was: "Return the deposit to us and *let's renegotiate this matter from the beginning* * * * That's a solution to our problem." That suggestion was rejected by Mr. Fasolo and his client.

### THE EVENTS AFTER THE ABORTED CLOSING

Mr. Fasolo and his client thereupon left Mr. Altus' office. Later that day Mr. Fasolo spoke to the counsel for the title company, Max Weiss. Following that conversation, at about 3:00 P.M., Mr. Fasolo called Mr. Altus and told him of his telephone discussion with Mr. Weiss. Mr. Fasolo testified that he advised Mr. Altus that Mr. Weiss had stated to him that "it could be properly handled by means of an escrow agreement whereby the company held the funds, but he [Mr. Weiss] said there's nothing we can do unless and until we get the approval of our client [i.e., the vendee]." He testified that he

further told Mr. Altus that he had an additional thought as to the substitute mortgage, to wit, that upon paying off the Shelton mortgage (and this could be done because of the prepayment clause therein), his client would obtain an assignment of the mortgage (rather than a satisfaction) so that *he* could then furnish the necessary estoppel certificate. Mr. Fasolo further testified that he told Mr. Altus that he was making this offer as an addition to putting up moneys in escrow, and that he asked Mr. Altus to "call up his title company and see if he couldn't make arrangements." Mr. Fasolo testified that Mr. Altus' response was: "No, the closing has terminated. It's too late. I'm not going to do anything about it, *you return the deposit, we'll renegotiate,* and if you don't return the deposit, we'll start an action".

Mr. Altus testified, on rebuttal, that although he did receive a call from Mr. Fasolo later that day, it was "[n]ot to * * * [his] recollection" that Mr. Fasolo had asked him to call anyone from the title company to confirm what Mr. Fasolo had said. He admitted that Mr. Fasolo had stated "that he had worked it out with the title company, and the title company was going to insure us." Mr. Altus continued by saying, "what the arrangements were * * * I did not know what he was doing, what kind of insurance, what the mechanics were * * * I just did not know." In any event, Mr. Altus conceded that he did not call the title company after Mr. Fasolo's call.

### ANALYSIS OF THE EVIDENCE

We note that Trial Term stated that the alternatives were "the contractually required estoppel certificate or an appropriate title company insurance policy." As to the former, it is the law of the case that an estoppel certificate was not an absolute requisite (see *Grace v Nappa,* 48 AD2d 922, *supra).* As to the latter, the weight of the evidence demonstrates that the reason the title company did not furnish "an appropriate title company insurance policy" was because the vendee's attorney refused to consent to an agreement by the title company to the vendor's proposals to furnish an appropriate sum of money to be held in escrow by the title company, or to have the vendor accept a substitute mortgage containing the identical terms of the Shelton mortgage.

The record makes it clear beyond doubt that the vendee-plaintiff was unwilling to go through with the deal without

getting a substantial concession from the vendor—occupation of the premises for 90 days at the expense of the vendor—and was using the absence of the estoppel certificate as a "squeeze play".

Would not a buyer who really wanted to go through with his deal accept the 15 checks as clear documentary proof that the mortgage was in good standing, or accept the vendor's alternative offers of depositing $200,000 or more in escrow, or substituting an entirely new mortgage in the agreed upon amount? The question answers itself.

The position of the vendee that the concomitance of "time of the essence" and the vendor's failure to produce the estoppel certificate gave him the right to refuse to take title, no matter what proofs or offers the seller submitted in place thereof, remind one of the words of Aesop's wolf, as stated to the lamb, "You are good at finding answers, but I am going to eat you all the same."

It should be emphasized that we are not dealing here with a lien on the premises as to which the contract was silent (cf. *Friedman v Fishbein,* 215 App Div 174; *Smith v Browning,* 171 App Div 278). Rather, we are dealing with a case where the vendee agreed to take title subject to (and assuming) a mortgage not in excess of a stated amount. We are thus dealing with an issue of proof, and not of substance.

Undoubtedly, the best proof would have been the mortgage estoppel certificate, as was indeed provided for in the contract, but it is the law of the case, founded upon common sense and decisional authority, that this was not the only possible proof.

On the record in this case it is clear that the refusal of the vendee to accept the paid checks as proof of the reduced amount of the mortgage or, in the alternative, to consent to the placing of $200,000 in escrow with the title company as to a mortgage, originally in the sum of $200,000, made four years earlier, and which in the normal course (as shown by the mortgage papers, the amortization schedule and the "paid" checks) would have been amortized down to $138,518.49 (give or take four cents!), when combined with the vendor's offer to accept a substitute mortgage from the vendee (since the Shelton mortgage provided for absolute prepayment), was completely arbitrary and unreasonable. The proof and offers were such that a vendee, *who in good faith desired to abide by the contract and take title,* would have accepted.

True, the alternative suggested by the vendor (assuming

that the paid checks themselves were not sufficient proof of the reduced amount of the mortgage and that it was in good standing) required the consent of the title company. It is ironic, however, that the plaintiff, in his brief, seeks to use that requirement for consent on the part of the title company to justify his refusal to accept such arrangements when the failure to obtain that consent was based on his statement that he would not agree to the title company's consent thereto.

Contrary to the determination of the trial court, I do not believe that the alternative proposals made by the vendor at the closing, if indeed in view of the production of the paid checks they were required to be made, were such that they could not have been implemented on the law date. There is no proof to indicate that the vendor was unable to implement his suggestion of the production of $200,000 *and more* in the early afternoon of the law date. Appellant testified that there was no problem on that score and plaintiff's counsel did not cross-examine him as to that issue. As to the preparation of a new bond and mortgage, every attorney experienced in title closings knows that the preparation of new mortgage papers, bearing the identical terms as the existing mortgage, would take substantially less than an hour.

A reading of the transcript makes it clear that the closing was not consummated on the date fixed for the closing because of the lack of good faith on the part of the vendee. That is confirmed by the fact that, after the closing aborted, and while it was still no later than midafternoon, the vendee's attorney refused to call the title company's counsel to confirm or to disprove Mr. Fasolo's statement that the title company agreed to accept the substitute documents and escrow funds *if the vendee would permit that.*

The fact that the contract contained the *in terrorem* provision making time of the essence made it *more,* not less, obligatory upon the vendee to accept adequate proof of the balance of the mortgage, since he was buying real property, not an estoppel certificate.*

---

* It should also be noted, as somewhat diluting the alleged mandatory effect of the time of the essence clause, that it was followed in the contract by a typed provision (par VIII) which contemplated the possibility that the vendor would not be able to deliver possession on the closing date, for it provided, *inter alia,* that: "In the event the seller should fail to deliver possession at the time of closing, then $50,000 of the purchase price shall be held by Fasolo and Krause, Attorneys for the seller, in escrow, until such time as possession of the premises is delivered to the Purchaser in accordance with the terms hereof."

This court should not place its stamp of approval on the egregious behavior of the plaintiff shown by this record. The judgment in favor of the plaintiff should be reversed, his complaint should be dismissed and the case should be remanded to Special Term to pass upon appellant's counterclaim for specific performance or, alternatively, for the recovery of money damages, if any, sustained by him.

GULOTTA, J. (dissenting). I would affirm the judgment on the opinion of Madam Justice BURSTEIN at Trial Term and in accordance with the following additional comments.

Although a painstaking review of the record reveals that the learned Justice at Trial Term was in error insofar as she observed that the so-called "new mortgage proposal" propounded by appellant's counsel was only discussed *after* the closing had aborted and the parties had separated, the mere fact that the proposal was initially made at the closing itself is of no legal significance where, as here, the contract provided that time was of the essence and the credible evidence supports her alternative conclusion that appellant was not prepared to implement said proposal on the law day (e.g., by securing the necessary satisfaction piece from the then-mortgagee in order to extinguish the pre-existing mortgage).* Unless coupled with the contemporaneous extinguishment of the pre-existing mortgage or the implementation of an escrow agreement to insure its satisfaction (which no one alleges was discussed at the closing), appellant's "new mortgage proposal"

---

* I do not, as do my colleagues in the majority, read paragraph VIII of the contract as lessening the impact of paragraph VII thereof, insofar as the latter provides that "time shall be deemed as of the essence as against both the Seller and the Purchaser." Rather, I read paragraph VIII as providing a specific penalty (i.e., liquidated damages) in the event that the seller is unable to deliver possession (as distinguished from title) as of the date fixed for the closing. Thus, paragraph VIII provides the following: "In the event the Seller shall fail to deliver possession at the time of closing, then $50,000 of the purchase price shall be held by Fasolo and Krause, Attorneys for the Seller, in escrow, until such time as possession of the premises is delivered to the Purchaser in accordance with the terms hereof. *In addition, the Seller agrees to pay to the Purchaser for the use and occupancy of the premises herein, the sum of Two Hundred ($200) Dollars per day for each and every day from the date of the closing of title to the date of the delivery of possession of said premises.* This sum shall be paid to the Purchaser out of the aforesaid escrow sum which is to be deposited with the attorneys for the Seller, in the event possession is not delivered at the time of closing. *The parties further agree that from and after the date of closing of title, the Purchaser shall not be required or obligated to furnish the Seller with heat, hot water or utilities, the Seller agreeing to continue to maintain the premises during such period as is herein provided.*" (Emphasis supplied.)

could not possibly provide the plaintiff with the "secure * * * knowledge that he was buying a house on the terms to which he had agreed", which, we have held, was his due *(Grace v Nappa,* 48 AD2d 922). As with the factual conclusions of Trial Term on the other aspects of this case, which turn upon closely contested issues of credibility, it is well established that issues of credibility are primarily entrusted to the original trier of the facts *(Electrolux Corp. v Val-Worth, Inc.,* 6 NY2d 556, 566), and that, where the testimony conflicts, the evaluation of the testimony by the trial court, based upon its assessment of credibility, should be afforded great weight and should not be readily overturned *(Matter of Lensol Fabric Co. [Arcola Fabrics Corp.],* 51 AD2d 954). It is not for the Appellate Division to disturb factual findings based upon conflicting evidence and involving the credibility of witnesses unless it is obvious that the trial court's conclusion cannot be sustained by any fair interpretation of the evidence *(Burnett Process v Richlar Inds.,* 55 AD2d 812).

HOPKINS, J. P., and O'CONNOR, J., concur with SHAPIRO, J.; GULOTTA, J., dissents and votes to affirm the judgment, with an opinion, in which COHALAN, J., concurs.

Judgment of the Supreme Court, Nassau County, entered June 30, 1977, reversed, on the law and the facts, with costs, complaint dismissed, and action remanded to Trial Term for further proceedings with regard to the counterclaim in accordance with the opinion herein.